# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER HYDE, | ) | CASE NO.  5:24-cv-120 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| NSM INSURANCE GROUP, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is the motion for summary judgment (Doc. No. 20 (Motion)) filed by defendant NSM Insurance Group ("NSM"). Plaintiff Christopher Hyde ("Hyde") opposes the motion (Doc. No. 22 (Opposition)), and NSM Insurance filed a reply (Doc. No. 23 (Reply)). The Court ordered supplemental briefing (Doc. No. 24 (Order Requesting Additional Briefing); *see* Doc. No. 25 (Hyde Supplemental Brief); Doc. No. 26 (NSM Supplemental Brief);  (Doc. No. 27 (NSM Supplemental Reply); Doc. No. 28 (Hyde Supplemental Reply)). For the reasons discussed herein, the motion for summary judgment is granted and the case is dismissed.

## I.  BACKGROUND

Hyde started working at NSM as an underwriter in March 2021. (Doc. No. 1 (Complaint) ¶¶ 8–9; Doc. No 21-1 (Deposition of Christopher Hyde and Exhibits), at 22 (21:18–20).)[1] Hyde's job duties, which were all performed remotely, included speaking to policyholders about their vehicles and underwriting the risk of insuring those vehicles. (Doc. No. 21-1, at 26–27 (25:8–

---

[1] Page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system. Given that depositions appear on the docket with additional pagination, for ease of reference, a second number appearing in parentheses reflects the corresponding page and line number supplied by the court reporter.

26:3).) Though Hyde worked remotely, the NSM employee handbook explains that shifts are determined and assigned by an employee's manager or department head. (Doc. No. 21-2 (Deposition of Robert DiClementi and Exhibits), at 227–28 (NSM Employee Handbook (Work Schedule Policy)).) If an employee wishes to change the hours they are scheduled to work for a particular day, they must get prior approval from their manager. (*Id.*; *see also* Doc. No. 21-1, at 25 (24:3–5) (Hyde explaining his scheduled shifts were 10:30 A.M. to 7:15 P.M.).) Robert DiClementi ("DiClementi") was Hyde's supervisor. (Doc. No. 21-1, at 27 (26:18–21).)

On August 14, 2023, Hyde messaged DiClementi, explaining he put in a paid time off ("PTO") request for August 24 and 25, 2023, to care for his sick father, who was scheduled to have surgery. (Doc. No. 21-2, at 278 (Microsoft Teams messages).) DiClementi responded that Hyde's PTO request was unlikely to be "a problem[,]" but did not notify Hyde that he might be eligible to take leave under the Family Medical Leave Act ("FMLA") for this time period. (*Id.*) On September 1 and September 11, 2023, Hyde told DiClementi that his father was back in the hospital.[2] (*Id.* at 279, 280.) DiClementi commiserated with Hyde, but again did not notify him of his rights under the FMLA. (*Id.*)

Hyde does not recall how he first learned about the FMLA. (*See* Doc. No. 21-1, at 55–57 (54:11–56:12) (Hyde explaining he may have heard about the FMLA from a coworker, family member, or from his father's hospital).) But on September 20, 2023, after reading the NSM handbook's section on FMLA leave, Hyde emailed Human Resources and Payroll Manager, Martina Travis ("Travis"), to ask about his eligibility to take intermittent unpaid leave under the

---

[2] The record does not reveal whether Hyde took PTO or unpaid leave on or around September 1 and September 11, 2023, to care for his father. (*Compare* Doc. No. 21-2, at 89 (87:7–12) (DiClementi explaining Hyde used PTO to care for his father in September 2023) *with id.* at 281 (Hyde's 9/21/2023 message to DiClementi explaining he was taking an unpaid day off to care for his father).)

FMLA to care for his sick father. (Doc. No. 21-1, at 174–75 (email chain)). In his email to Travis, Hyde acknowledged that he had exhausted his allotted PTO for the year. (*Id.*) Travis promptly responded that Hyde was eligible for FMLA leave and directed him to apply as a caregiver for his father if the doctor provided written documentation to that effect. Additionally, Travis indicated that she attached an email from Guardian, NSM's third-party benefits provider, explaining how to file for leave and described the process. (*Id.* at 174.) Travis also advised Hyde that he would "need to get the paperwork filed and approved and any time pertaining to that specifically would be excused and unpaid if [he had] no PTO remaining." (*Id.*)

Hyde submitted his first claim for FMLA leave through Guardian on September 22, 2023, requesting intermittent leave from September 21, 2023, through December 13, 2023. (Doc. No. 21 (Deposition of Martina Travis and Exhibits), at 278–79 (initial letter to Hyde from Guardian confirming his eligibility to apply for FMLA leave).) Guardian responded on September 28, acknowledging receipt of Hyde's application, and explaining that Hyde's father's physician must complete an enclosed certification form, and that Hyde must return the form within 15 calendar days from the date of the letter. (*Id.* at 279) Guardian further explained that if the certification was not returned within the specified timeframe, Hyde's request for leave may be delayed or denied. (*Id.*)

It is unclear from the record how many days Hyde was absent from work between September 21 and 28, 2023, but a conversation between DiClementi and Hyde indicates Hyde missed at least part of two workdays during this period. (Doc. No 21-1, at 169–71 (text stream).) On September 27, 2023, Operations Manager Alison Dudley ("Dudley") and DiClementi scheduled a video call with Hyde to discipline him for unexcused absences. (Doc. No. 21-2 , at 119–20 (117:5–118:10).) When Hyde explained that he had filed a claim for FMLA leave and was

awaiting approval from Guardian, Dudley and DiClementi decided not to move forward with disciplinary action pending the outcome of Hyde's FMLA claim. (*Id.* at 120–22 (118:14–120:4).)

On October 12, 2023, Guardian notified Hyde via email that the medical certification form he submitted was incomplete. (Doc. No. 26-2 (10/12/2023 Form Incomplete Letter), at 2.) The email directed him to resubmit the form, "taking care to include the data listed as incomplete . . . and [to] return [the form] . . . within seven days*." (Id.)* Guardian further indicated that once they received the complete form, they would make a determination on Hyde's requested leave. (*Id.*) Hyde did not return a completed form within seven days. (*See* Doc. No. 21-2, at 305 (email chain) (10/26/2023 email from Hyde to Natter indicating that Hyde's father's doctor had not yet resubmitted the medical certification form).)

On October 17, 2023, two days before Guardian's deadline for resubmitting the medical certification form, Natter emailed Hyde to remind him to submit the proper paperwork and stressed that Hyde was still out on unapproved leave.[3] (*Id.* at 307.) The same day (October 17, 2023), Hyde responded, "I brought in the paperwork to the hospital on Friday to have it corrected. Now it appears they cannot find it. I have asked Matt at Guardian if he has received it but have received no response. I am printing and having another copy submitted ASAP." (*Id.* at 306.) A week later, Natter asked Hyde for an update, but Hyde did not respond. (*Id.*)

On October 26, 2023, Natter emailed Hyde again, stating that she had received notice from Guardian that Hyde's September 22, 2023 claim for FMLA leave had been denied. (*Id.* at 305–06.) Hyde responded, "I spoke with the doctor personally today, gave her a new copy [of the

---

[3] It is unclear from the record how much time Hyde took off between September 29, 2023, and October 17, 2023. Conversations between DiClementi and Hyde indicate Hyde missed all or part of at least five days in this period. (Doc. No. 21-2, at 300–02.) Other correspondence with Natter indicates that Hyde had been out "for multiple weeks" by October 26, 2023. (*Id.* at 305 (email).)  Hyde testified that he was not sure how much leave he took during this period. (Doc. No. 21-1, at 44 (43:10–15).)

medical certification form] and she said that she will fill it out and refax it. I have already explained to her that the paperwork needs to be filled out in a particular way so that it isn't denied again." (*Id.* at 305.) Hyde followed up six minutes later, explaining "[t]his morning I already have filed a new claim for FMLA leave since [the September 22, 2023 claim] was canceled before the doctor could get the information in." (*Id.*) Natter responded, "unfortunately, you have been out on unapproved unpaid leave for multiple weeks now. If we don't have an approval in by the end of next week, Martina [Travis] will need to handle from there." (*Id.*)

On October 30, 2023, Hyde submitted a medical certification form in support of his new, October 26, 2023 claim for leave. (Doc. No. 25-2 (10/30/2023 Certification of Health Care Provider), at 1–5.) The next day (October 31, 2023), Travis and DiClementi scheduled a Microsoft Teams meeting with Hyde "to remind him to get his paperwork completed properly." (Doc. No. 21, at 149 (147:4–7), 150 (148:4–13).) Travis warned that if Hyde did not submit a proper certification form by the end of that week, which would have been Friday, November 3, 2023, NSM would terminate him.[4] (Doc. No. 21-2, at 148 (146:13–21).) Hyde became frustrated. (Doc. No. 21-1, at 92–93 (91:25–92:2).) After explaining he was "done having a circle conversation[,]" Hyde announced he was taking the rest of the day off. (*Id.* at 92 (91:19–23).) He then unilaterally ended the online meeting. (*Id.*)

After the meeting, Travis emailed Hyde, explaining she construed his "unprofessional behavior during [the] meeting and abrupt departure" as a job resignation. (Doc. No. 21-1, at 177 (10/31/2023 email chain).) "Today will be your last day with American Collectors Insurance." (*Id.*)  NSM "shut down" Hyde's work accounts, preventing him from logging in to work again.

---

[4] In setting Friday, November 3, 2023, as the date for this ultimatum, NSM extended the seven-day deadline provided to Hyde on October 12, 2023, by Guardian (Doc. No. 25-3 (10/12/2023 Form Incomplete Letter), at 1) for submitting a second medical certification form.

(*Id.*) On January 22, 2024, Hyde filed a complaint in federal court against NSM, asserting two causes of action under the FMLA. (Doc. No. 1.)

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, the district court views the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A factual dispute is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant

probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991) (citation omitted). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (noting that summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an essential element of that party's case and on which that party will bear the burden of proof at trial). Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and cannot defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; "[a] mere scintilla of evidence is insufficient." *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (citing *Anderson*, 477 U.S. at 247–48 (quotation marks omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted).

### III. DISCUSSION

The FMLA guarantees qualifying employees up to twelve weeks of unpaid leave per year to care for an immediate family member with a serious health condition. 29 U.S.C. §§ 2612(a)(1), (a)(1)(C). An employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]," nor may an employer "discharge or in any other manner discriminate against any individual" for exercising their FMLA rights. § 2615(a)(1)–(2). The Sixth Circuit recognizes two discrete theories of recovery under the FMLA: the interference theory arising from § 2615(a)(1) and the retaliation theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012) (citations omitted). Hyde filed claims under both theories of recovery (Doc. No. 1 ¶¶ 49–55 (Interference Claim), 56–63 (Retaliation Claim)), and NSM seeks summary judgment on both claims. (Doc. No. 20.) The Court will address each claim in turn.

### A. Interference Claim

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]." 29 U.S.C. § 2615(a)(1). To establish a *prima facie* FMLA interference claim, Hyde must demonstrate (1) he was an eligible employee; (2) NSM was a covered employer; (3) he was entitled to leave under the FMLA; (4) he gave NSM notice of his intention to take FMLA leave; and (5) NSM denied FMLA benefits to which he was entitled. *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 577–78 (6th Cir. 2007) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)) (further citation omitted)). The parties agree that Hyde has established the first two elements.

NSM asserts that Hyde cannot demonstrate entitlement to leave because he "did not submit an adequate medical certification" (Doc. No. 26, at 2) from his father's doctor, despite having

ample opportunity to do so. *See Lott v. Playhouse Square Hotel, LLC*, No. 1:20-cv-1515, 2021 WL 3847783, at *7 (N.D. Ohio Aug. 27, 2021) (granting summary judgment on interference claim because plaintiff failed to establish she was entitled to FMLA leave because she did not provide sufficient medical certification, despite having opportunity to do so); *see also Frazier v. Honda of Am. Mfg., Inc.*, 431 F.3d 563, 567 (6th Cir. 2005) (affirming summary judgment because plaintiff failed to establish he was entitled to FMLA leave because he did not timely submit a medical certification). The Court agrees.

### i.    Failure to provide complete and sufficient medical certification

To "garner [the FMLA's] benefit, an employee must abide by the conditions provided in 29 U.S.C. § 2613, which provides, *inter alia*, that an employer may require an employee to submit a doctor's certification" of the employee's family member's serious health condition. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 554 (6th Cir. 2006); *see* 29 C.F.R. § 825.305(a) (2025) (medical certification requirements for employees seeking FMLA leave to care for a family member). NSM provides notice of its certification requirement in its employee handbook, which states that employees seeking FMLA leave relating to "the serious health condition of a family member" must provide sufficient medical certification "as soon as practicable." (Doc. No. 21-2, at 244–245 (FMLA Policy).) Accordingly, in its first email to Hyde on September 28, 2023, Guardian explained that certification by Hyde's father's healthcare provider was necessary to determine whether Hyde's leave request would be approved. (Doc. No. 21 (9/28/2023 FMLA Eligibility Letter), at 278–79.) The FMLA regulations explain what information the medical certification must include to support a request for intermittent leave to care for a family member:

> (1) The name, address, telephone number, and fax number of the health care provider and type of medical practice/specialization;
> (2) The approximate date on which the serious health condition commenced, and its probable duration;

(3) A statement or description of appropriate medical facts regarding the patient's health condition for which FMLA leave is requested. The medical facts must be sufficient to support the need for leave. Such medical facts may include information on symptoms, diagnosis, hospitalization, doctor visits, whether medication has been prescribed, any referrals for evaluation or treatment (physical therapy, for example), or any other regimen of continuing treatment;

* * *

(5) If the patient is a covered family member with a serious health condition, information sufficient to establish that the family member is in need of care . . . and an estimate of the frequency and duration of the leave required to care for the family member;

(6) If an employee requests leave on an intermittent or reduced schedule basis for planned medical treatment of the employee's or a covered family member's serious health condition, information sufficient to establish the medical necessity for such intermittent or reduced schedule leave and an estimate of the dates and duration of such treatments and any periods of recovery;

* * *

(8) If an employee requests leave on an intermittent or reduced schedule basis to care for a covered family member with a serious health condition, a statement that such leave is medically necessary to care for the family member . . . which can include assisting in the family member's recovery, and an estimate of the frequency and duration of the required leave.

29 C.F.R. §§ 825.306(a)(1)–(3), (5), (6), (8).[5]

It is undisputed that the first medical certification Hyde submitted was insufficient to establish entitlement to FMLA leave. (Doc. No. 26-2, at 2; *see* Doc. No. 25, at 2–3.) Hyde argues that he "provided a sufficient medical certification that addressed the original missing pieces of information on October 30, 2023," to establish entitlement to all the leave he took between September 22 and October 30, 2023, as well as entitlement to future leave "that he had yet to use." (Doc. No. 25, at 3.) But based on the undisputed facts in the record, the Court finds that Hyde's October 30, 2023 medical certification (Doc. No. 25-2, at 1–5) was both incomplete and

---

[5] This information is also listed in the NSM employee handbook section on FMLA rights. (Doc. No. 21-2, at 244–45.).

insufficient as a matter of law. *See* 29 C.F.R. § 825.305(c) ("[a] certification is considered incomplete if . . . one or more of the applicable entries have not been completed" and a "certification is insufficient if the information provided is vague, ambiguous, or non-responsive").

First, the "Health Care Provider Statement" portion of Hyde's submission filled out by Dr. Kasey Scharf does not answer the form's prompt to "[p]rovide the medical facts that support the identification of this condition as a 'Serious Health Condition' for which the employee needs FMLA leave from work (may include diagnosis, symptoms, treatment or supervision, surgery, hospitalization, etc.) and the treatment or symptoms of this condition[.]" (Doc. No. 25-2, at 4.) Instead, Dr. Scharf simply wrote a list of seven medical conditions including liver cirrhosis, hepatic encephalopathy, DM II, and Anemia.[6] (*Id.*) A list of diagnoses, without medical facts explaining why each diagnosis, either separately or in combination, requires FMLA leave, is insufficient. *See Coffman v. Ford Motor Co.,* 719 F. Supp. 2d 856, at 865–66 (S.D. Ohio 2010), *aff'd,* 447 F. App'x 691 (6th Cir. 2011) (certification that merely listed medications prescribed to employee and did not explain facts supporting the diagnosis, treatment needs, or whether her condition prevented her from performing her job duties, was insufficient).

Second, though the form urges the provider to "provide your best estimate [about duration of the patient's condition]; 'unknown' or 'indeterminate may not be sufficient to determine FMLA coverage[,]" Dr. Scharf listed Hyde's father's next scheduled appointment as "TBD" and the probable duration of his condition as "weeks-months." (Doc. No. 25-2, at 4). This, too, is insufficient. *See Novak*, 503 F.3d at 578–79 (medical certification form was insufficient because it did not contain the probable duration of the condition or other appropriate medical facts within the health care provider's knowledge).

---

[6] The other three terms are illegible to the Court.

Third, the form leaves two questions about Hyde's father's treatment schedule, including whether he had been prescribed medication and how many times he would receive medical treatment during Hyde's requested leave period, completely blank. (Doc. No. 25-2, at 4). This part of the form also does not answer the prompt about contact information for other healthcare providers Hyde's father was referred to. (*Id.*) Courts have found similar omissions to be fatal to an employee's *prima facie* case. *See Porter v. Donahoe*, 484 F. App'x 589, 590–91 (2d Cir. 2012) (plaintiff's medical certification was incomplete because he failed to answer several questions about his mother's treatment and did not indicate the number of days that he would need to be absent from work to assist her).

Finally, though the part of the form filled out by Hyde requests intermittent leave between September 21, 2023, and December 13, 2023 (Doc. No. 25-2, at 2), Dr. Scharf's section only refers to leave between September 27, 2023, and November 3, 2023 (*id.* at 5). This is "vague, ambiguous, or non-responsive as to whether" leave was medically necessary "during the [entire] period for which [Hyde] sought leave[.]" 29 C.F.R. § 825.305(c); *see Swegan v. Shepherd of the Valley Lutheran Ret. Servs., Inc.*, No. 4:11-cv-2179, 2013 WL 1284309, at *7 (N.D. Ohio Mar. 25, 2013) (plaintiff's medical certification was insufficient because it did not explain whether plaintiff was incapacitated during the period she sought leave).

The Court finds that Hyde's October 30, 2023 form is both incomplete and insufficient under 29 C.F.R. § 825.305(c) because several questions are either blank or incompletely answered, and several other answers are vague or non-responsive to the form's prompts. Dr. Scharf did not provide requisite information to demonstrate the medical necessity for Hyde's intermittent leave.

12

*See* 29 C.F.R. § 825.306(a) (explaining what information the medical certification must include to support a FMLA request for intermittent leave to care for a family member).[7]

### ii.    NSM's affirmative procedural duties

Despite never submitting a sufficient certification form, Hyde correctly notes (Doc. No. 28, at 3–6) that NSM may not be entitled to summary judgment if NSM did not meet the FMLA's affirmative procedural requirements for employer notice under 29 C.F.R. § 825.300(a)–(b) and for opportunity to produce and cure deficient medical certifications under § 825.305(a)–(c). *See Perry v. Jaguar of Troy*, 353 F.3d 510, 514 (6th Cir. 2003) ("Because there is no evidence that defendant requested medical certification pursuant to the requirements of the FMLA, [plaintiff]'s failure to provide medical certification does not support summary judgment for defendant.") But the record shows that NSM satisfied or exceeded the FMLA process requirements.

The employer notice requirements found in 29 C.F.R. § 825.300(a) cover general notification duties about FMLA rights, including information that can be published electronically and via an employee handbook. In its employee handbook, NSM provides notice that it is a covered employer and explains who is eligible for leave, how eligible employees may request leave, and what medical certification is required of leave applications. (Doc. No. 21-2, at 242–46.) Thus, NSM satisfies § 825.300(a)'s requirements.

Next, under 29 C.F.R. § 825.300(b), the employer's duty to "notify the employee of his eligibility to take FMLA leave within five business days, absent extenuating circumstances" is

---

[7] Two letters from Guardian after Hyde's termination show that Guardian never approved Hyde's October 30, 2023 medical certification because it was incomplete. The first letter, dated November 7, 2023, explained that Hyde's October medical certification had been determined incomplete and stated that Hyde been provided with a "summary of the missing information." (Doc. No. 20-5 (11/7/2023 Form Incomplete Letter), at 2.) The second letter, dated November 27, 2023, explained that Hyde's October 26, 2023, application was denied for the same reason as the September 22, 2023, application: "[Medical] Certification Not Returned." (Doc. No. 20-6 (11/27/2023 Determination Letter), at 2.) Though Hyde averred that he received an approval letter for intermittent leave on November 1, 2023 (Doc. No. 1 ¶ 53), he does not point to anything in the record upon which a jury could find that his medical certification was approved.

triggered when an employee expresses an intention to take potentially FMLA-qualifying leave. 29 C.F.R. §§ 825.300(b). When Hyde emailed Travis on September 20, 2023, to ask about his eligibility to take intermittent FMLA leave, Travis promptly confirmed that he was eligible, and subsequently directed him to Guardian. (Doc. No. 21-1, at 174–75.) This satisfies § 825.300(b)'s command.

But Hyde argues that he first gave DiClementi notice of intent to take leave for his father's surgery in May or June via email (Doc. No. 22, at 9; Doc. No. 21-1, at 39–40 (38:25–39:16)), months before his September 20, 2023 emails with Travis (Doc. No. 21-1, at 174–75). Hyde claims that "[d]espite knowing that Mr. Hyde needed to take medical leave due to his father being in surgery, Mr. DiClementi failed to inform Mr. Hyde about the FMLA protections to which he was entitled."[8] (Doc. No. 22, at 10.) Though the record does not reveal any email requests made by Hyde in May or June, DiClementi does not dispute that he failed to provide Hyde with FMLA eligibility notice in mid-August and September 2023 after Hyde twice expressed intentions to take potentially FMLA-qualifying leave. (*See* Doc. No. 21-2, at 88–89 (86:4–87:6) (DiClementi explaining he did not think he had a reason to bring up the FMLA in response to Hyde's 8/14/2023 request for PTO to care for his father), 92 (90:3–21) (DiClementi explaining he was unsure why he did not advise Hyde of his FMLA rights in response to Hyde's 9/1/2023 notification that he needed to care for his father).)

An employer's defective FMLA notice can be actionable if the employee demonstrates he suffered prejudice as a result of the violation. *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89, 122 S. Ct. 1155, 1161, 152 L. Ed. 2d 167 (2002) (holding that an employee must "ha[ve]

---

[8] The Court construes Hyde's complaint to mean that DiClementi did not provide Hyde timely notice of his potential *eligibility* for FMLA leave, since entitlement to leave could be established only through submission of a complete and sufficient medical certification. *See* 29 C.F.R. § 825.305(a).

been prejudiced by the violation" to obtain relief under the FMLA); *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 484 (6th Cir. 2010) (same). "An employee can show prejudice by demonstrating that 'had she been properly informed of her FMLA rights, she could have structured her leave differently.'" *Drummond v. Murray-Calloway Cnty. Pub. Hosp. Corp.*, No. 5:19-cv-42, 2021 WL 5236876, at *4 (W.D. Ky. Nov. 10, 2021) (citing *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 323 (3d Cir. 2014)) (further citations omitted). Hyde contends that because of NSM's delayed notice of his FMLA eligibility, he was "forced to use PTO for his [August] leave." (Doc. No. 22, at 10.)

But Hyde has not established that DiClementi's earlier, defective eligibility notice prevented him from structuring his leave differently—that is, from using FMLA leave rather than PTO for this period of time. As the Court has explained, Hyde cannot demonstrate FMLA entitlement to the leave he took to care for his father after he received proper eligibility notice from Travis on September 20, 2023. Hyde has not identified any record evidence that he would have been able to demonstrate entitlement to the leave he took before then. *See Dorsey v. Jacobson Holman, PLLC*, 476 F. App'x 861, 862 (D.C. Cir. 2012) (concluding plaintiff could not show prejudice where she "provide[d] no record evidence whatsoever that she could have structured her leave differently"); *see also Fink v. Ohio Health Corp.*, 139 F. App'x 667, 671 (6th Cir. 2005) (finding no prejudice from defendant's failure to notify plaintiff of the availability of intermittent FMLA leave because plaintiff "had no right to intermittent leave, regardless of whether she had adequate notice"); *Thompson v. Diocese of Saginaw,* No. 2-10267, 2004 WL 45519, at *8 (E.D. Mich. Jan. 6, 2004) (finding no prejudice from defendant's failure to comply with the FMLA's notice obligations because "there is no evidence on the record" that plaintiff would have been

15

eligible to "claim the protection provided by the Act" even if she had known about its availability). Hyde has thus not established that DiClementi's earlier, defective eligibility notice was prejudicial.

Finally, pursuant to what 29 C.F.R. § 825.305(b) requires of an employer requesting medical certification, NSM, through Guardian, gave Hyde fifteen days to submit his first certification form. (Doc. No. 21, at 278–79.) When the form was found to be deficient, NSM, through Guardian, satisfied its duty under § 825.305(c) to notify Hyde of the deficiency, to "state in writing what additional information is necessary to make the certification complete and sufficient[,]" and to give him seven days to resubmit. (Doc. No. 25-3, at 1); 29 C.F.R. § 825.305(c). NSM then voluntarily extended this seven-day deadline by fifteen days to November 3, 2023. (*See* Doc. No. 21-2, at 148 (146:13–21).)

Hyde, however, notes that § 825.305(c)'s seven-day deadline applies "unless not practicable under the particular circumstances despite the employee's diligent good faith efforts." 29 C.F.R. § 825.305(c). Citing this equitable tolling clause, Hyde contends that NSM did not give him adequate time to produce the second, deficient certification because the "determination of what a reasonable time to cure or what time frame was practicable under these facts and circumstances should go to a jury to decide[,] [as] reasonable minds can come to two different conclusions." (Doc. No. 28, at 5.) This argument is unavailing.

First, after Guardian properly gave Hyde the minimum period of seven days (Doc. No. 25-3, at 1), which Hyde failed to meet, NSM volunteered a fifteen-day extension from October 19, 2023, to November 3, 2023. (*See* Doc. No. 21-2, at 148 (146:13–21) (Travis setting Friday, November 3, 2023, as the final date for Hyde to submit a sufficient certification form).)  Second, the question before the Court is not whether NSM is entitled to summary judgment because Hyde submitted his second certification after October 19, 2023, but whether NSM is entitled to summary

16

judgment because Hyde did not offer sufficient medical certification at any time between September 22, 2023, and October 31, 2023. The regulations do not require employers to wait for more than two attempts at a sufficient certification. *See* 29 C.F.R. § 825.305(d) ("If the employee fails to provide the employer with a complete and sufficient certification, despite the opportunity to cure the certification as provided in paragraph (c) of this section . . . the employer may deny the taking of FMLA leave[.]") Hyde does not argue NSM failed to meet any other affirmative duties set out by the FMLA regulations.

Hyde has not offered evidence to establish a genuine issue of material fact as to whether he was entitled to FMLA leave. On the contrary, the record reveals that Hyde never produced sufficient medical certification to support his request for leave. *See Novak,* 503 F.3d at 580 (affirming summary judgment because there was no dispute of material fact over whether plaintiff was entitled to leave). This is fatal to his interference claim, and NSM is entitled to judgment as a matter of law. *See Kinds v. Ohio Bell Tel. Co.*, 724 F.3d 648, 654 (6th Cir. 2013) ("the failure to provide a medical certification is an independent basis for denying FMLA leave notwithstanding the appropriateness of that leave").

## B.  Retaliation Claim

Hyde also asserts a FMLA retaliation claim. To establish a *prima facie* claim of FMLA retaliation, Hyde must show that "(1) he was engaged in a statutorily protected activity; (2) [NSM] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger*, 681 F.3d at 283 (citation omitted). Hyde's FMLA retaliation claim fails because he cannot establish the first element.

Hyde cites the Sixth Circuit's opinion in *Milman v. Fieger & Fieger, P.C.* to argue that "in order for a plaintiff employee to exercise his rights and engage in protected activity under the FMLA, he need only start the process with 'a request made to the employer. That request, moreover, need not lead to entitlement in order to be protected.'" (Doc. No. 25, at 4 (quoting *Milman v. Fieger & Fieger*, 58 F.4th 860, 871 (6th Cir. 2023).) Indeed, an employee's initial request "must be protected activity under the Act. FMLA rights and the statute's purpose would be significantly diminished if employers could fire an employee who simply took the required initial steps to access FMLA leave." *Milman*, 58 F.4th at 869.

In *Milman,* the Sixth Circuit reversed dismissal of a FMLA retaliation claim brought by a plaintiff who was terminated the same day she asked about taking plausibly FMLA-qualifying leave to care for her child, who had a history of respiratory illness and was experiencing COVID-19 symptoms at the beginning of the COVID-19 pandemic. *Id.* at 863–64. The question before the court was whether the plaintiff-employee had to actually demonstrate entitlement to FMLA leave to care for her child in order to show that she was engaged in FMLA-protected activity when she was terminated, the first element of a *prima facie* retaliation claim.[9] *Id.* at 867.

*Milman* clarified that what "protected activity" requires from a plaintiff-employee depends on the facts of the case. *See id*. at 867–68. The Sixth Circuit set out two categories of FMLA

---

[9] Before *Milman,* the Sixth Circuit repeatedly required FMLA retaliation claimants to demonstrate entitlement to leave to show they engaged in protected FMLA activity. *See, e.g.*, *Katoula v. Detroit Ent., LLC*, 557 F. App'x 496, 499 (6th Cir. 2014) (concluding that because plaintiff was not entitled to the leave he took, he was not engaged in FMLA-protected activity)*; Palmer v. Cacioppo*, 429 F. App'x 491, 496–97 (6th Cir. 2011) (same); *Morris v. Fam. Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 338 (6th Cir. 2009) (same); *Nawrocki v. United Methodist Ret. Cmtys. Inc.*, 174 F. App'x 334, 339 (6th Cir. 2006) (same); s*ee also Branham v. Gannett Satellite Info. Network, Inc*., 619 F.3d 563, 568 (6th Cir. 2010) ("To prevail on . . . her retaliation claim, Branham must prove that she was entitled to FMLA leave." (citations omitted)). The court distinguished those prior cases from *Milman*, noting that "[t]his case presents an entirely different circumstance. . . . This case does not involve a plaintiff who *took* the leave requested, as in [those prior cited cases]; instead, the question is whether the FMLA protects the right of an employee to inquire about and request leave[.]" *Milman*, 58 F.4th at 868–69 (emphasis in original).

retaliation claims. *Id*. at 867–69. The first category involves employee-claimants like Milman, who have not actually taken leave, and who have not already exhausted the FMLA application process established by the statute and regulations. *Id*. For these types of claimants, engaging in the "steps of the [application] process created by the FMLA—including the first step, *i.e.,* the employee's initial request for leave" is sufficient to "fall within the scope of protected activity, without regard to ultimate entitlement." *Id*. at 869; *see also Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 1000 (8th Cir. 2011) (rejecting argument that employee never engaged in protected activity because employer terminated her before her FMLA certification paperwork was due).

The second category of FMLA retaliation claims involves employee-claimants who actually took leave, and who have already exhausted the FMLA application process established by the statute and regulations. *Milman,* 58 F.4th at 868. For this category of cases, the Court held, "entitlement [to leave] is a prerequisite to an FMLA retaliation claim[.]" *Id*. Even though this category of claimants presumably engaged in *per se* protected FMLA application activity at some point, "the FMLA protects leave that is taken only if it falls within the scope of entitlement; taking leave to which the employee was not entitled unambiguously falls outside the FMLA's protections." *Id.*

The undisputed record reveals that between September 22 and October 31, 2023, Hyde took intermittent, unapproved leave and exhausted the protected "procedural framework the statute established[.]" *Id.* at 869. This puts Hyde in *Milman*'s second category of retaliation claimants, for whom entitlement to leave is a prerequisite to showing he engaged in protected activity.[10] *Id.* at

---

[10] Further unlike the defendant-employer in *Milman* who fired Milman for merely inquiring about FMLA and taking initial steps to access protected leave, *Milman*, 58 F.4th at 872, between September 22, 2023 and October 30, 2023, NSM repeatedly encouraged, rather than discouraged, Hyde to secure entitlement to FMLA leave. *See, e.g.* (Doc. No. 21-1, at 172 (Natter emailing Hyde on October 12, 2023, stating, "I have received alerts from Guardian that your paperwork for FMLA has not been completed. Please get in contact with them as soon as possible as your FMLA/leave has not been approved yet."); Doc. No. 21-2, at 306–07 (Natter's email to Hyde, on October 24, 2023, asking for an

868. Though NSM voluntarily gave Hyde an extended deadline of November 3, 2023, to submit his second medical certification, fifteen days past the seven-day period required by 29 C.F.R. § 825.305(c), Hyde has not produced any authority establishing that an employer's voluntary extension receives the same statutory protection as the procedural framework established by the FMLA regulations. *Milman,* 58 F.4th at 867–70.

Additionally, the Court finds that NSM complied with what the Sixth Circuit interpreted the FMLA to require in *Milman*. Presumably recognizing the protected nature of the initial request stage, Dudley and DiClementi did not move forward with a planned disciplinary action for Hyde's unexcused absences on September 27, 2023, after learning that Hyde was awaiting approval for his claim for FMLA leave. (Doc. No. 21-2, at 119–22 (117:5–120:4).) Because Hyde can demonstrate neither entitlement to the intermittent leave he took between September 22, 2023, and October 31, 2023, nor that he was engaged in a protected period of the FMLA's procedural framework when he was terminated, summary judgment is proper. *See Milman,* 58 F.4th at 869–72 (noting plaintiff-employee's initial inquiry about FMLA leave to care for her immunocompromised son who was showing COVID-19 symptoms at the beginning of the pandemic was a protected exercise of the FMLA procedural framework); *accord Hamilton v. Norfolk S. Corp.,* No. 1:21-cv-740, 2024 WL 4827008, at *2–4 (S.D. Ohio Nov. 19, 2024) (denying defendant-employer's motion for summary judgment where plaintiff-employee was terminated the day after notifying her supervisor that she may seek FMLA leave to care for her mother who was on a ventilator after contracting COVID-19) (citing *Milman*, 58 F.4th at 866–67) (further citations omitted); *see also* 29 C.F.R. § 825.305(d) (if the employee fails to timely provide

---

update about Hyde's medical certification resubmission. Hyde did not respond.)); (Doc. No. 21-1, at 174–75 (Travis's email to Hyde on September 20, 2023, advising Hyde to apply for FMLA as a caregiver for his father)).

a complete and sufficient certification, despite being given proper opportunity to correct deficiencies, the regulations do not require employers to wait for completion of a second application before denying leave).

### C. Hyde Was Terminated for a Legitimate, Non-discriminatory, Non-retaliatory Reason

As the Court has explained, NSM is entitled to summary judgment on both of Hyde's claims because Hyde cannot demonstrate that he was entitled to leave, *see supra,* Section A, or that he was engaged in protected FMLA activity, *see supra,* Section B. But even if Hyde could establish a *prima facie* interference or retaliation claim, summary judgment would still be proper because NSM offered a legitimate, non-discriminatory, non-retaliatory reason for his termination and Hyde has failed to demonstrate that this reason is a mere pretext for unlawful discrimination or retaliation under the *McDonnell Douglas* burden shifting framework.[11] *See Seeger*, 681 F.3d at 284–85 (employer properly granted summary judgment where employee could not establish that employer's stated reason for discharge was a pretext for unlawful FMLA retaliation); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973) (discussing the burden-shifting analysis).

### i.  *McDonnell Douglas* burden-shifting analysis

"Both FMLA interference and FMLA retaliation claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*[.]" *Clemons v. Hillshire Brands Co.*, No. 23-5622,

---

[11] NSM asks the Court to find that Hyde resigned by abandoning his shift on October 31, 2023 (Doc. No. 20-1, at 17–18), or in the alternative, that he was terminated for a legitimate reason. (*Id.* at 18–20.) Under Ohio common law, there are two types of voluntary resignations: constructive resignation and effective resignation. *Anderson v. Bright Horizons Children's Centers*, LLC, No. 20AP-291, 2022 WL 910157 ¶ 39 (Ohio Ct. App. May 29, 2022) (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 448 (6th Cir. 1999)). Because Hyde denied resigning (*see* Doc. No. 21-1, at 177 (10/31/2023 email chain)), the Court construes NSM's resignation argument to refer to constructive resignation. (*See Hammon*, 165 F.3d at 448 (effective resignation requires the employee to express an intention to resign) (citation omitted)). But whether Hyde constructively resigned or was terminated by NSM is not a question that the Court needs to answer because Hyde is not entitled to relief under the FMLA in either circumstance.

2024 WL 3355379, at *2 (6th Cir. Apr. 11, 2024). Under this framework, the burden is placed first on the plaintiff to establish a *prima facie* case of FMLA interference or retaliation. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citation omitted). If the plaintiff meets his burden to establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory reason for its actions. *McDonnell Douglas Corp.*, 411 U.S. at 802. The defendant's burden is one of production not persuasion. *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 500 (6th Cir. 2016) (citing *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 589 (6th Cir. 2009)). If the defendant provides such a reason, the burden shifts back to the plaintiff to establish that the defendant's proffered reason was pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 804. The defendant's reason is pretextual if it has no basis in fact, did not actually motivate the action, or was insufficient to warrant the action. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 530 (6th Cir. 2020) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

Assuming Hyde had made a *prima facie* showing on either of his claims, the burden would have shifted to NSM to establish a legitimate reason for his termination on October 31, 2023. *McDonnell Douglas Corp.*, 411 U.S. at 802. NSM offers several undisputed reasons for terminating Hyde immediately following the October 31, 2023 meeting, including "insubordiation[,]" "h[a]ng[ing] up on his superiors[,]" and leaving work in the middle of his shift without approval. (Doc. No. 20-1, at 14–15.) NSM also argues that Hyde repeatedly directed profanity at DiClementi and Travis—another reason for his termination. (*Id.* at 14; *see also* Doc. No. 21, at 161 (159:11–19) (Travis explaining that Hyde directed "the F word" at her and DiClementi multiple times on the 10/31/2023 call).) Hyde disputes this account. (Doc. No. 22, at

24; *see also* Doc. No. 21-1, at 93 (92:20–25) (Hyde explaining that he does not recall whether he told Travis to f-off).)

NSM's employee handbook provides that "[i]nsubordinate behavior to a manager or other supervisory person[,]" "[n]eglect of duty[,]" and "[f]ailure to follow company policy" may lead to termination "without any previous disciplinary action having been taken."[12] (Doc. No. 21-2, at 232.) "Company policy" requires employees to obtain approval from their managers to change the hours that they are scheduled to work and prohibits "[l]eaving work early without authorization" and "unexcused absence." (*Id.* at 230.)

Hyde admits that he became frustrated with DiClementi and Travis on the October 31, 2023 call. (Doc. No. 21-1, at 92–93 (91:25–92:2).) "[W]hen I realized [Travis] was not listening and not hearing what I'm saying, I told [Travis and DiClementi] flat out that I was not gonna have the conversation any longer, we would reconvene when the documents were in and I was taking the rest of the day off." (*Id.* at 91–92 (90:23–91:3)) Hyde then "click[ed] out of the meeting and h[u]ng up the Teams call" after telling Travis and DiClementi that he was "done having a circle conversation like this, we'd reconvene when the documents were submitted and I was done for the day." (*Id.* at 92 (91:19–23).) Such conduct may qualify as insubordinate behavior, failure to follow company policy, and/or insubordination, as set forth in the handbook—all conduct that, the NSM handbook explains, may lead to an employee's termination. (*See* Doc. No. 21-2, at 232.)

---

[12] Hyde argues that NSM did not follow its own policy on progressive discipline when it terminated him without first issuing several warnings (Doc. No. 22, at 9, 13), but the Handbook provides notice that the behavior Hyde engaged in on the October 31, 2023 call ("insubordinat[ion]," "[n]eglect of duty[,]" and "[f]ailure to follow company policy[,]" among other things) may lead to termination "without any previous disciplinary action having been taken." (Doc. No. 21-2, at 232); s*ee, e.g., Pelcha v. MW Bancorp, Inc*., 988 F.3d 318, 329 (6th Cir. 2021) (defendant terminating plaintiff for insubordination "without any progressive steps taken" did not constitute evidence of pretext, noting that while defendant's employment manual is "clear that progressive discipline is 'typically' implemented and 'may follow' certain steps, [] the very next sentence makes clear that '[s]ome performance concerns [such as insubordination] are serious enough not to follow a progressive schedule'" (quoting record)).

Critically, the record reveals that Hyde's announcement that he was "done having a circle conversation like this" was the first notice DiClementi received that Hyde would not be completing the workday. (Doc. No. 21-1, at 92 (91:19–23).) Travis's deposition referenced an email from Guardian, dated November 1, 2023, indicating that Hyde had a pending FMLA request for six hours of leave on October 31, 2023. (Doc. No. 21, at 186 (184:4–22).) But Hyde testified that he put in this request *after* he unilaterally ended the October 31, 2023 meeting and left work for the day without authorization. (Doc. No. 21-1, at 95–96 (94:22–95:3).) Hyde does not point to anything else in the record from which a jury could find that he did not violate NSM company policy that day. (Doc. No. 21-2, at 230, 232 (employee handbook explaining that "[f]ailure to follow Company policy[,]" which requires employees to obtain approval from their managers before changing the hours that they are scheduled to work, may lead to termination).)

The Sixth Circuit has held that discharging an employee for violating company policy is a legitimate ground for termination. *See Tillman v. Ohio Bell Tel. Co.,* 545 F. App'x 340, 349 (6th Cir. 2013) (affirming summary judgment where plaintiff's violation of the "company's Code of Business Conduct" was a "legitimate, non-discriminatory reason for [his] termination"); *see, e.g.*, *Hill v. TK Elevator Mfg. Inc.*, No. 22-cv-1258, 2024 WL 4269776, at *12 (W.D. Tenn. Sept. 23, 2024) ("Once it was determined that Plaintiff's absences in March 2021 were not covered by the FMLA, she was in violation of the attendance policy. . . . This was a legitimate non-retaliatory reason for her termination."). Thus, by citing the undisputed record that Hyde hung up on his superiors, thereby unilaterally ending the meeting, and stopped working for the day without authorization, NSM has met its *McDonnell Douglas* burden to produce a legitimate reason for Hyde's termination.

This shifts the burden back to Hyde to establish that the reason NSM offered is pretextual. *McDonnell Douglas Corp.*, 411 U.S. at 804; *see Keith v. Siromed Physicians Servs., Inc.*, No. 20-cv-12551, 2022 WL 303362, at *6 (E.D. Mich. Feb. 1, 2022 ("Plaintiff must present additional evidence rebutting Defendants' proposed reasons for terminating her to survive summary judgment." (citing *Hodnett v. Chardam Gear Co., Inc.*, 749 F. App'x 390, 394 (6th Cir. 2018))). To meet this burden, Hyde must provide evidence that NSM's reason for the adverse employment action "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 576 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1021 (6th Cir. 2000)). Hyde argues that the reasons for his termination were pretextual because he "testified that he did not swear during the meeting[.]" (Doc. No. 22, at 24.) But as the Court has explained, NSM offered additional, undisputed grounds for termination that are legitimate: hanging up on his superiors and then ceasing work for the day without authorization.[13] (*See* Doc. No. 21-1, at 92 (91:19–23).) The NSM handbook provides notice that insubordination and failure to follow company policy on attendance (among other things) may lead to termination "without any previous disciplinary action having been taken." (Doc. No. 21-2, at 232.)

Hyde also offers in the way of pretext that "NSM began to construct a disciplinary record against [him] based on attendance with the intent to terminate him if he were unable to get FMLA approval" and "NSM terminated him after harassing him about his FMLA leave on October 31, 2023." (Doc. No. 22, at 5–6.) But as the Court has explained, the record reveals that NSM gave Hyde more opportunity than the FMLA requires to establish entitlement to FMLA leave (Doc. No. 21-2, at 148 (146:13–21) (Travis setting Friday, November 3, 2023, as the final date for Hyde to

---

[13] For remote employees like Hyde, this is the equivalent of storming out of the office in the middle of the workday.

submit a sufficient certification form)), allowed him to take intermittent, unapproved leave for over a month (Doc. No. 21-2, at 305 (10/26/2023 email from Natter indicating Hyde had been out on unapproved, intermittent leave "for multiple weeks")), and repeatedly encouraged Hyde to secure approval for FMLA leave between September 20, 2023, and October 31, 2023 (*see, e.g.*, Doc. No. 21-1, at 172; Doc. No. 21-2, at 306–07). "An employee who requests FMLA leave [has] no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request[,]" like insubordination and unapproved departures from work, "than he or she did before submitting the request." *Weimer v. Honda of Am. Mfg., Inc.*, 356 F. App'x 812, 818 (6th Cir. 2009) (citing *Arban v. W. Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (further citation omitted)). Hyde offers no other arguments about pretext and has failed to come forward with any disputed facts that would support an inference of pretext. Thus, summary judgment on Hyde's retaliation claim is proper.

## IV. CONCLUSION

For the reasons set forth herein, defendant NSM Insurance Group's motion for summary judgment (Doc. No. 20) is granted and this case is dismissed.

**IT IS SO ORDERED**.

Dated: March 12, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**